LAW OFFICES OF MARK YABLONOVICH
Mark Yablonovich (SBN 186670)
Mark@Yablonovichlaw.com
Monica Balderrama (SBN 196424)
Monica@Yablonovichlaw.com
9465 Wilshire Boulevard, Suite 300
Beverly Hills, California 90212-2511
Telephone: (310) 286-0246 • Fax: (310) 407-5391

CAPSTONE LAW APC
Melissa Grant (SBN 205633)
Melissa.Grant@capstonelawyers.com
Bevin Allen Pike (SBN 221936)
Bevin.Pike@capstonelawyers.com
Daniel Jonathan (SBN 262209)
Daniel.Jonathan@capstonelawyers.com
Trisha K. Monesi (SBN 303512)
Trisha.Monesi@capstonelawyers.com
1875 Century Park East, Suite 1860
Los Angeles, California 90067
Telephone: (310) 556-4811 • Fax: (310) 943-0396

Attorneys for Plaintiffs Jose Cuevas, Dora Meza de Castillo,
Proposed Representative Gloria Hernandez, and the Putative Class

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSE CUEVAS and DORA MEZA DE CASTILLO, on behalf of themselves, all others similarly situated, and on behalf of the general public,<br><br>        Plaintiffs,<br><br>    v.<br><br>LITTLE CAESAR ENTERPRISES, INC.; and DOES 1 through 10, inclusive,<br><br>        Defendants. | Case No. 3:23-cv-03166-RFL<br><br>**PLAINTIFFS' MOTION FOR CLASS CERTIFICATION; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>Judge:     Hon. Rita F. Lin<br>Date:      January 6, 2026<br>Time:      1:30 p.m. (Via Zoom)<br>Location:  U.S. District Court<br>           San Francisco Courthouse<br>           Courtroom 15, 18th Floor<br>           450 Golden Gate Avenue<br>           San Francisco, California 94102<br><br>Action Filed:   May 12, 2023<br>Removal:      June 26, 2023<br>FAC:          June 17, 2025 |

# TABLE OF CONTENTS

I.   INTRODUCTION ........................................................................................................... 6

II.  PROCEDURAL AND FACTUAL BACKGROUND ................................................... 7

     A.   Procedural History ............................................................................................ 7

     B.   Little Caesars' Non-Exempt Employees .......................................................... 8

     C.   Little Caesars' Policies .................................................................................... 8

          1.   Little Caesars' Store Opening Policies Require Employees to Perform Pre-Shift
               Off-the-Clock Work ............................................................................... 8

          2.   Little Caesars' Store Closing Policies Require Employees to Perform Off-the-
               Clock Work ............................................................................................. 9

          3.   Little Caesars' Rest Period Policy Fails to Provide Lawful Breaks ............ 10

          4.   Little Caesars Failed to Calculate the Correct Regular Rate of Pay ............ 11

          5.   Little Caesars' Weekly Overtime Calculation Improperly Excludes Daily
               Overtime .................................................................................................. 11

III. ARGUMENT ................................................................................................................. 12

     A.   The Legal Standard for Class Certification Under Rule 23 ............................. 12

     B.   The Class and Subclasses Meet Rule 23(a) .................................................... 13

     C.   Common Questions of Law or Fact Predominate Plaintiffs' Theories of Liability ................. 15

          1.   The Opening Shift Class Should Be Certified ....................................... 15

               (a)  Little Caesars' Opening Policies and Procedures Result in Unpaid Hours
                    Worked ..................................................................................... 15

               (b)  The Opening Shift Subclass Meets Rule 23(a)(2) ................... 17

               (c)  Common Issues Predominate in the Opening Shift Class ....... 17

          2.   The Closing Shift Class Should Be Certified .......................................... 18

               (a)  Little Caesars' Closing Policies and Procedures Result in Unpaid Hours
                    Worked ..................................................................................... 18

               (b)  The Closing Shift Class Meets Rule 23(a)(2) ......................... 20

               (c)  Common Issues Predominate in the Closing Shift Class ......... 20

3.    The Rest Break Class Should Be Certified ......................................................... 21

    (a)    Little Caesars' Facially Invalid Rest Break Policy Resulted in a Failure to

        Provide Rest Breaks ................................................................................ 21

    (b)    The Rest Break Class Meets Rule 23(a)(2) ............................................. 23

    (c)    Common Issues Predominate in the Rest Break Class ............................ 23

4.    The Regular Rate Class Should Be Certified .................................................... 24

    (a)    Miscalculated Regular Rates of Pay Results in Unpaid Wages ............. 24

    (b)    The Regular Rate Class Meets Rule 23(a)(2) ......................................... 25

    (c)    Common Issues Predominate in the Regular Rate Class ........................ 25

5.    The Weekly Overtime Underpayment Class Should Be Certified ...................... 26

    (a)    Little Caesars Incorrectly Calculated Weekly Overtime ....................... 26

    (b)    The Weekly Overtime Underpayment Class Meets Rule 23(a)(2) .......... 28

    (c)    Common Issues Predominate in the Weekly Overtime Class ................ 28

D.    The Court Should Certify the Derivative Claims .................................................... 28

E.    Class Action Is Superior to Other Available Methods for Fairly and Efficiently

    Adjudicating the Controversy ................................................................................. 29

IV.    CONCLUSION ................................................................................................................. 30

PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

1

**TABLE OF AUTHORITIES**

2

**FEDERAL CASES**

3  *Abdullah v. U.S. Sec. Assocs.*, 731 F.3d 952 (9th Cir. 2013)..................................................14, 22

4  *Adoma v. Univ. of Phoenix, Inc.*, 270 F.R.D. 543 (E.D. Cal. 2010) ..............................................16

5  *Alvarez v. IBP, Inc.*, 339 F.3d 894 (9th Cir. 2003) ......................................................................18

6  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997)................................................................21

7  *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680 (1946) ........................................................19

8  *Arredondo v. Delano Farms Co.*, 301 F.R.D. 493 (E.D. Cal. 2014) ............................................28

9  *Avilez v. Pinkerton Gov't Servs.*, 286 F.R.D. 450 (C.D. Cal. 2012)..............................................28

10 *Blackie v. Barrack*, 524 F.2d 891 (9th Cir. 1975) .......................................................................12

11 *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121 (9th Cir. 2017)..................................................15

12 *Dilts v. Penske Logistics, LLC*, 267 F.R.D. 625 (S.D. Cal. 2010)............................................28, 30

13 *Escano v. Kindred Healthcare Operating Co., Inc.*, No. 09-04778, 2013 U.S. Dist. LEXIS

14      29899 (C.D. Cal. Mar. 5, 2013) .........................................................................................26

15 *Frausto v. Bank of Am.*, 334 F.R.D. 192 (N.D. Cal. 2019)..........................................................18

16 *Gulf Oil Co. v. Bernard*, 452 U.S. 89 (1981)..............................................................................13

17 *Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (9th Cir. 1998).................................................... passim

18 *Howell v. Advantage RN, LLC*, No. 17-CV-0883 JLS (BLM), 2018 U.S. Dist. LEXIS

19      119360 (S.D. Cal. July 17, 2018)........................................................................................26

20 *In re Taco Bell Wage & Hour Actions*, 2012 U.S. Dist. LEXIS 168219 (E.D. Cal. Nov. 27,

21      2012) .................................................................................................................................12

22 *Jimenez v. Allstate Ins. Co.*, 765 F.3d 1161 (9th Cir. 2014)..........................................16, 29, 30

23 *Kamar v. Radio Shack Corp.*, 254 F.R.D. 387 (C.D. Cal. 2008) .................................................29

24 *Kurihara v. Best Buy Co.*, No. C. 06-01884, 2007 U.S. Dist. LEXIS 64224 (N.D. Cal. Aug.

25      30, 2007) ......................................................................................................................17, 23

26 *Lerwill v. Inflight Motion Pictures, Inc.*, 582 F.2d 507 (9th Cir. 1978) .........................................29

27 *Leyva v. Medline Indus. Inc.*, 716 F.3d 510 (9th Cir. 2013) ....................................................12, 13

28 *Martin v. Selker Bros., Inc.*, 949 F.2d 1286 (3d Cir. 1991)..........................................................30

PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

Case No. 3:23-cv-03166-RFL

1  *Minns v. Advanced Clinical Emp. Staffing LLC*, 2015 U.S. Dist. LEXIS 71946 (N.D. Cal.
2      June 2, 2015) .................................................................................................................. 13
3  *Rannis v. Recchia*, 380 Fed.App'x. 646 (9th Cir. 2010) ................................................... 13
4  *Rodriguez v. Hayes*, 591 F.3d 1105 (9th Cir. 2010) ......................................................... 14
5  *Rodriguez v. URS Midwest, Inc.*, 2023 U.S. Dist. LEXIS 143826 (C.D. Cal. Aug. 15,
6      2023) ............................................................................................................................... 18
7  *Staton v. Boeing Co.*, 327 F.3d 938 (9th Cir. 2005) ......................................................... 15
8  *United Steel Workers v. Conoco-Phillips Co.*, 593 F.3d 802 (9th Cir. 2010) ................... 12
9  *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227 (9th Cir. 1996) ..................................... 29
10 *Vedachalam v. Tata Consultancy Servs., Ltd.*, No. C 06-0963 CW, 2012 U.S. Dist. LEXIS
11     46429 (N.D. Cal. Apr. 2, 2012) ................................................................................ 18, 23
12 *White v. Starbucks Corp.*, 497 F. Supp.2d 1080 (N.D. Cal. 2007) .................................... 28
13 *Wolin v. Jaguar Land Rover North America, LLC*, 617 F.3d 1168 (9th Cir. 2010) ................. 12

15 **STATE CASES**
16 *Alvarado v. Dart Container Corp. of Cal.*, 4 Cal.5th 542 (2018) ................................. 24, 27
17 *Amaral v. Cintas Corp. No. 2*, 163 Cal.App.4th 1157 (2008) .......................................... 19
18 *Bell v. Farmers Ins. Exchange*, 115 Cal.App.4th 715 (2004) .......................................... 30
19 *Brinker Rest. Corp. v. Super. Ct.*, 53 Cal.4th 1004 (2012) ................................. 13, 22, 23
20 *Bufil v. Dollar Fin. Grp., Inc.*, 162 Cal.App.4th 1193 (2008) ......................................... 22
21 *Faulkinbury v. Boyd & Assocs., Inc.*, 216 Cal.App.4th 220 (2013) ................................. 26
22 *Ferra v. Loews Hollywood Hotel, LLC*, 11 Cal.5th 858 (2021) ........................................ 24
23 *Godfrey v. Oakland Port Services Corp.*, 230 Cal.App.4th 1267 (2014) .......................... 22
24 *Hernandez v. Mendoza*, 199 Cal.App.3d 721 (1988) ....................................................... 19
25 *Mendiola v. CPS Security Solutions, Inc.*, 60 Cal.4th 833 (2015) ............................. 16, 21
26 *Morillion v. Royal Packing Co.*, 22 Cal.4th 575 (2000) ............................................ 16, 21
27 *Sav-On Drug Stores, Inc.*, 34 Cal.4th 319 (2004) ........................................................... 30
28 *Troester v. Starbucks Corp.*, 5 Cal.5th 829 (2018) ......................................................... 19

FEDERAL STATUTES

Fed. R. Civ. P. 23(a) ........................................................................................................... 12, 13

Fed. R. Civ. P. 23(a)(1) ............................................................................................................. 13

Fed. R. Civ. P. 23(a)(2) ..................................................................................................... passim

Fed. R. Civ. P. 23(a)(3) ............................................................................................................. 14

Fed. R. Civ. P. 23(a)(4) ............................................................................................................. 15

Fed. R. Civ. P. 23(b)(3) ..................................................................................................... passim

STATE STATUTES

8 Cal. Code Reg. § 11050(2)(K) ............................................................................................... 16

8 Cal. Code Reg. § 11050(12)(A) ........................................................................................ 21, 22

Cal. Lab. Code § 200 ................................................................................................................. 24

Cal. Lab. Code § 226.7(a) .......................................................................................................... 21

Cal. Lab. Code § 226.7(c) .......................................................................................................... 24

Cal. Lab. Code § 246(*l*) ............................................................................................................... 24

Cal. Lab. Code § 510(a) ........................................................................................... 24, 26, 27, 28

SECONDARY AUTHORITIES

DLSE Enforcement Policies and Interpretation Manual, ¶ 35.7 .................................................. 24

Newberg on Class Actions § 4:50 (5th ed.) ................................................................................ 13

1    **MEMORANDUM OF POINTS AND AUTHORITIES**

2    **I.    INTRODUCTION**

3    By this Motion for Class Certification, Plaintiffs Jose Cuevas and Dora Meza de Castillo

4    ("Plaintiffs") and proposed representative Gloria Hernandez seek to represent one class and five

5    subclasses of approximately 4,796 non-exempt, hourly employees who have worked for Little Caesar

6    Enterprises, Inc. ("Defendant" or "Little Caesars") at its California stores and who, as a result of Little

7    Caesars' uniform illegal policies and practices, have been subject to unpaid off-the-clock hours worked,

8    rest break violations, miscalculated regular rate of pay for overtime, meal premiums, and sick pay,

9    underpaid overtime, and derivative violations of the California Labor Code for non-compliant wage

10    statements, untimely payment of wages during employment and at termination, secret underpayment of

11    wages, and violations of California's unfair competition laws. Each of Plaintiffs' theories of liability is

12    amenable to class treatment because each is predicated on Little Caesars' statewide, uniform policies and

13    practices, which raise predominant common questions of law or fact that will yield common answers

14    based on common proof. Plaintiffs' theories of liability and the corresponding subclasses are:

15    **(1)    Opening Shift Subclass:** Little Caesars' opening policies and procedures require work-

16    related tasks or duties before employees are permitted to clock in.

17    **(2)    Closing Shift Subclass:** Little Caesars' closing policies and procedures require work-

18    related tasks or duties after employees clock out and before they are permitted to leave the store at night.

19    **(3)    Rest Break Subclass:** Little Caesars' rest break policies and procedures do not authorize

20    and permit employees to take compliant rest breaks when required and systematically fail to pay any

21    premiums.

22    **(4)    Regular Rate Subclass:** Little Caesars underpaid the regular rate of pay for overtime,

23    meal premiums, and sick pay.

24    **(5)    Overtime Subclass:** Little Caesars incorrectly counted weekly overtime hours worked.

25    Each theory of liability posits predominant common questions—whether Little Caesars' policies

26    and practices are lawful—that will yield common answers, and Plaintiffs can establish classwide liability

27    and damages for all Class Members in a single proceeding. Proceeding on a classwide basis achieves

28    maximum judicial efficiency. Accordingly, Plaintiffs respectfully request that this Court grant their

Page 6

Motion for Class Certification in its entirety by:

(i)    Certifying the Class, Opening Shift Subclass, Closing Shift Subclass, Rest Break Subclass, Regular Rate Subclass, and Overtime Subclass as well as derivative claims for non-compliant wage statements, untimely payment of wages during employment and at termination, secret underpayment of wages, and violations of California's unfair competition laws;

(ii)    Appointing Plaintiffs Jose Cuevas, Dora Meza de Castillo, and proposed Plaintiff Gloria Hernandez[1] as class representatives; and

(iii)    Appointing the Law Offices of Mark Yablonovich and Capstone Law as class counsel.

## II.    PROCEDURAL AND FACTUAL BACKGROUND

### A.    Procedural History

On May 12, 2023, Plaintiff Jose Cuevas filed this wage and hour putative class action in Santa Clara County Superior Court titled *Cuevas v. Little Caesar Enterprises, Inc.*, Case No. 23CV416083 (the "Action").[2] Plaintiff Cuevas brought the Action on behalf of all persons currently or formerly employed by Defendant as hourly non-exempt employees within the State of California during the class period.

On June 26, 2023, Defendant removed the Action. (ECF No. 1 at 4:2-8.) Defendant represented that the putative class included more than 19,000 employees. (*Id.* at 6:13-15; 8:5-9; ECF No. 1-2 at ¶ 7.)

On June 20, 2024, Defendant produced a putative "class list" which consists of 4,796 unique employee identification numbers. (Declaration of Monica Balderrama ["Balderrama Decl."], ¶ 8.) The class list contains persons who are hourly non-exempt employees in California and who did not sign the Mutual Agreement to Arbitrate Claims ("MAAC"). (*Id.*)

After litigating the scope of arbitration agreements, the number of putative class members, which the parties have agreed do not include employees who signed the MAAC, is 4,796. (*Id.*, ¶¶ 8-9.)

---

[1] Plaintiffs anticipate promptly filing a motion for leave to amend to add Ms. Hernandez, a former employee, as a class representative.

[2] *See* ECF No. 1, Ex. A. Prior to filing this Action, on November 5, 2020, Plaintiff Cuevas filed a California Private Attorneys General Act ("PAGA") action against Defendant titled *Cuevas v. Little Caesar Enterprises, Inc.*, in Santa Clara County Superior Court, Case No. 20CV373147 ("*Cuevas* PAGA Action"). On February 7, 2024, the *Cuevas* PAGA Action and *Aldana v. Little Caesar Enterprises, Inc.* were coordinated in Santa Clara County Superior Court, *Little Caesar Wage and Hour Cases*, JCCP No. 5307. The PAGA-only coordinated cases are **not** part of this case or motion for class certification. (Balderrama Decl., ¶ 4.) For example, the non-derivative waiting time penalty claim in the *Cuevas* PAGA Action concerning Little Caesars' delay in paying final wages beyond the statutory time period is not a part of this class certification motion.

On June 17, 2025, the Court granted Plaintiff Cuevas leave to file a First Amended Complaint that added Plaintiff Dora Meza de Castillo as a plaintiff. (ECF No. 71.) On July 16, 2025, Little Caesars filed an Answer to the FAC. (ECF No. 74.)

**B.    Little Caesars' Non-Exempt Employees**

Little Caesars is an international pizza chain with over 200 corporate-owned stores in California. Little Caesars employs non-exempt employees called colleagues in various positions. For example, Crew Members make pizzas and dough, clean the restaurant, and generally work shifts that are less than eight hours. (Balderrama Decl., ¶ 29, Exhibit ["Ex."]. F, at CUEVAS_LCE-000148-151.) Assistant Managers similarly make pizzas and dough, clean the restaurant, and perform tasks as directed by another person of management. (*Id.*, Ex. F.) Co-Managers assist in managing the store, prepare products for and service customers, and are required to work at least 40 hours a week. (*Id.*, Ex. F, at CUEVAS_LCE-000303-305.) Restaurant Managers are responsible for scheduling, maintaining clean stores, and also assisting in pizza and dough making as needed. (*Id.*, Ex. F, at CUEVAS_LCE-000306-308; *see also* Castillo Decl. ¶ 8.)

**C.    Little Caesars' Policies**

Little Caesars' employee handbooks and Operational Resource Guide set forth policies that govern colleagues in California.

**1.    Little Caesars' Store Opening Policies Require Employees to Perform Pre-Shift Off-the-Clock Work**

Little Caesars' Security Guidelines provide the following store opening policies and procedures:

> **The following opening procedures will be followed by all colleagues when arriving at the restaurant to open:**
> – **Two or more colleagues arrive at the store to conduct opening procedures.**
> – ***Prior to the manager approaching the store, the parking lot and vicinity of the store should be thoroughly checked for any suspicious persons/vehicles.* Be aware of your surroundings. If there is anyone suspicious sitting in their car or loitering around the store or parking lot, leave the area immediately and call the police.**
> – If there are no suspicious threats, ***the manager approaches the store alone while the secondary colleague waits in their vehicle***, or at a safe distance, within viewing distance of the store's front door.
> – **The manager enters the facility, locks the front door and gives the "all clear" sign for the secondary colleague to enter the premises.**

(Balderrama Decl., ¶ 30, Ex. E, at CUEVAS_CLASS_LCE-000219, bold and italics added. *See also*

1    Castillo Decl. ¶ 12; Cuevas Decl. ¶ 12; Hernandez Decl. ¶ 8; Borges Decl. ¶ 5; Bruner Decl. ¶ 5; Chang

2    Decl. ¶ 5; Gomez Decl. ¶ 5; Ibarra Decl. ¶ 5; Martinez Decl. ¶ 5; Pedroza Decl. ¶ 5.)

3          At least two colleagues, with at least one being management (a non-exempt position), must be

4    present at the store at all times. (Balderrama Decl., ¶¶ 17, 18; *id.*, ¶ 32, Ex. E, at CUEVAS_CLASS_LCE-

5    000196; Castillo Decl. ¶ 12.)

6          The Safety & Security section of the Colleague Orientation, Training and Policies Handbook

7    states in pertinent part:

8             9. At no time can a colleague be alone in a Little Caesars store. There must be
                two colleagues in the store, with one of the two colleagues being a member of
9                management.

10   (Balderrama Decl., ¶ 17, Ex. B, at CUEVAS_ LCE-000152; *see also id.*, ¶ 18, Ex. B, at CUEVAS_ LCE-

11   000166 ["At no time can a colleague be alone in a Little Caesars store. There must be two colleagues in the

12   store, with one of the two colleagues being a member of management."].)

13                **2.    Little Caesars' Store Closing Policies Require Employees to Perform Off-**

14                       **the-Clock Work**

15         Closing a Little Caesars "restaurant is very involved." (Balderrama Decl., ¶ 35, Ex. E, at

16   CUEVAS_CLASS_LCE-000370.) Little Caesars' Security Guidelines provide that once the restaurant is

17   closed to the public, the front doors are locked[3] and must remain closed until "all closing colleagues" exit:

18            After close, the front door should remain closed and secured until all closing
                colleagues are ready to exit the store. No colleagues should exit the store to smoke
19            after the store closes.

20   (*Id.*, ¶ 31, Ex. E, at CUEVAS_CLASS_LCE-000219; *see also* Castillo Decl. ¶ 13.) Closing employees

21   must remain inside the locked store until they exit together: "At closing, all colleagues must leave at the

22   same time once the alarm is set in order to prevent any false alarm signals from the alarm system."

23   (Balderrama Decl., ¶¶ 33, 36, Ex. E, at CUEVAS _CLASS_LCE-000235; *see also* Borges Decl. ¶ 6;

24   Bruner Decl. ¶ 6; Chang Decl. ¶ 6; Flores Decl. ¶ 5; Gomez Decl. ¶ 7; Ibarra Decl. ¶ 6; Martinez Decl. ¶ 6;

25   Mercado Decl. ¶ 5; Munoz Decl. ¶ 5.) Little Caesars secures its California stores with security alarm

26   systems. (*Id.*, ¶¶ 33, 36, 44-46; *see also* Ex. E, at CUEVAS_CLASS_LCE-000235; *see also* Deposition of

27

28        ───────────────
          [3] Balderrama Decl., ¶ 36, Ex. E, at CUEVAS_CLASS_LCE-000374 ("Close ¶ Turn off open
     sign. Lock front doors.").

Jeffrey Ambrosia ["Ambrosia Dep. Tr."] at 109:3-5.)

The Time Management Guidelines direct employees to perform tasks ***after*** clocking-out:

| | |
|---|---|
| ○ ○ ○ ○ ○ ○ | Ensure all employees are clocked out. |
| ○ ○ ○ ○ ○ ○ | Turn off lights (including walk-in cooler & bathroom) and air conditioner. Leave pass-thru door open. |
| ○ ○ ○ ○ ○ ○ | Visually inspect surroundings of store for safety. |
| ○ ○ ○ ○ ○ ○ | Set alarm, unlock and exit through front door and re-lock. Always double-check that door is locked! |

(*Id.*, ¶ 36, Ex. E, at CUEVAS_CLASS_LCE-000374; *see also* Ex. K, Ambrosia Dep. Tr. at 110:19-20.)

### 3. Little Caesars' Rest Period Policy Fails to Provide Lawful Breaks

Little Caesars' Colleague, Orientation, and Training Policies Handbook for most of the relevant time period did not provide rest periods for shifts of exactly 3.5 hours and over 10 hours by setting forth the following incorrect and incomplete table:

| Hours Worked/ Hours Trabajadas | Required Rest Periods/ Descanso Requerido |
|---|---|
| **0 - 3.50** | **0 Rest Period** |
| 3.51 -6 | 1 Rest Period |
| **6.01 - 10** | **2 Rest Period** |

. . .

Colleagues who fail to comply with Little Caesar's [Rest Break Policy] will be subjected to Corrective Action, up to and including immediate termination of employment.

(Balderrama Decl., ¶ 19, Ex. C, at CUEVAS_LCE- 000245 (bold added); *see also id*., ¶ 22, Ex. K, Ambrosia Dep. Tr., at 123:6-8 ["Q: Under the policy shifts anywhere from 0 to 3 and a half hours are entitled to 0 rest periods, right? A. That is correct."].) Little Caesars' rest break policy did not authorize a rest period for shifts that are 3.5 hours long and third rest periods for shifts longer than ten hours.[4] (*See* Cuevas Decl. ¶ 11; Castillo Decl. ¶ 11; Hernandez Decl. ¶ 7; *see also* Borges Decl. ¶ 7-8; Bruner Decl. ¶ 8; Flores Decl. ¶ 7; Gomez Decl. ¶ 9; Ibarra Decl. ¶ 8; Luna Decl. ¶ 5-6; Martinez Decl. ¶ 8; Munoz Decl. ¶ 6; Muro Decl. ¶ 6; Pedroza Decl. ¶ 7; Velasco Decl. ¶ 5.)

---

[4] Little Caesars produced a **corrected** table dated April 9, 2025, that now appears to authorize and permit employees working shifts exactly 3.5 hours long to one rest period and more than ten hours to a third rest period. (Balderrama Decl., ¶ 47, Ex. G.)

**4.    Little Caesars Failed to Calculate the Correct Regular Rate of Pay**

A proposed subclass of non-exempt employees earns nondiscretionary bonuses calculated by

Little Caesars based on the following criteria:

> • Each period the manager may earn a "Sharing Base Pay" in the amount of ██ %
> of ██████████████████████████████████████████████████,
> • Store must be (1) ████████████ and (2) must ████████████████ % goals set by
> the Market Director and Zone Vice President.

(Balderrama Decl., ¶ 48, Ex. H, at CUEVAS_LCE-000275. *See also* Castillo Decl. ¶ 14.) The formulaic

bonus is paid as follows: "If earned, your sharing pay will be paid in the same manner as your regular

payroll, under the sharing program criteria and guidelines." (Balderrama Decl., ¶ 48, Ex. H; *see also* Ex. N,

Deposition of Charel Hill ["Hill Dep. Tr."] at 64:8-65:1 (confirming bonuses are nondiscretionary pay).

When Little Caesars made overtime regular rate of pay adjustments from the beginning of the

Class Period in 2019 to about January 2021, it incorrectly included non-working PTO hours that diluted

the value. (*See* Mendes Decl. ¶ 41.) Starting at the end of January of 2021, Little Caesars appears to have

changed its pay system, and stopped including non-working PTO hours into the overtime regular rate

calculation. (*Id.*, ¶ 47.) However, Little Caesars continued to fail to pay the correct regular rate of pay for

meal premiums until the end of February 2023. (*Id.*, ¶ 48.)

Little Caesars made retroactive payments "only to eligible restaurant managers" for meal

premiums and overtime regular rate adjustments. (Balderrama Decl., ¶ 49, Ex. I; *id.*, ¶ 50, Ex. J.) During

the course of this litigation, without informing Plaintiffs' counsel until it was revealed in discovery, Little

Caesars attempted to fix its mistake by retroactively paying currently (but not formerly) employed

restaurant managers adjusted meal premiums for having miscalculated the regular rate. (*Id.*, ¶¶ 51-54.)

However, there is no evidence that Little Caesars corrected its regular rate miscalculations—for both

overtime and meal premiums—from the beginning of the Class Period to the beginning of January 2021.

**5.    Little Caesars' Weekly Overtime Calculation Improperly Excludes Daily**
**Overtime**

Pursuant to Little Caesars' Company Handbook: "Once a colleague has been paid overtime for

hours over eight in a day, those overtime hours do not count toward the weekly 40-hour limit."

(Balderrama Decl., ¶ 23, Ex. B, at CUEVAS_ LCE-000178; *id.*, ¶ 24, Ex. D, at CUEVAS_CLASS_LCE-

000130.) An analysis of the time and payroll records confirms that only straight time hours were counted towards the 40-hour weekly overtime computation. (Mendes Decl. ¶¶14-19.) Contrary to Little Caesars' illegal policy and practice, Little Caesars' corporate representative on overtime wages admitted that ***all*** hours and not just straight time hours should be counted for weekly overtime. (Balderrama Decl., Ex. M, Deposition of Genaro Gomez ["Gomez Dep. Tr."], at 67:5-13.)

### III.    ARGUMENT

#### A.    The Legal Standard for Class Certification Under Rule 23

"To be certified, the putative class and sub-classes must meet the four threshold requirements of Federal Rule of Civil Procedure 23(a): numerosity, commonality, typicality, and adequacy of representation." Fed. R. Civ. P. 23(a); *see also Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998). "Moreover, the proposed class must satisfy the requirements of Rule 23(b), which defines three different types of classes." *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 512 (9th Cir. 2013). Rule 23(b) requires that one of three additional requirements be met. Here, the primary applicable inquiry is Rule 23(b)(3)—whether questions of law or fact common to the class predominate over those affecting only individual members, and whether a class is superior to other methods for the fair and efficient adjudication of the controversy.

While a plaintiff has the burden of demonstrating that Rule 23 requirements are satisfied, the burden is slight, and a plaintiff need only present sufficient proof to allow the Court to come to a "reasonable judgment" on each requirement. *Blackie v. Barrack*, 524 F.2d 891, 901 (9th Cir. 1975).

The Court's inquiry must revolve around Plaintiffs' theory of the case, ***not the merits or validity of that theory***. *United Steel Workers v. Conoco-Phillips Co.*, 593 F.3d 802, 808-809 (9th Cir. 2010) (finding district court abused its discretion in denying certification based on the possibility that plaintiffs will not prevail on their theory). *See In re Taco Bell Wage & Hour Actions*, 2012 U.S. Dist. LEXIS 168219, at *19 (E.D. Cal. Nov. 27, 2012) (certifying class where uniform policy was undisputed but defendant argued "as a matter of practice, the policy is carried out in a variety of ways").

Courts have broad discretion to certify a class, and district courts are accorded "noticeably more deference" when they grant certification rather than when they deny certification. *Wolin v. Jaguar Land*

*Rover North America, LLC*, 617 F.3d 1168, 1171 (9th Cir. 2010).[5] Courts hold that cases that are "susceptible to generalized proof like employment and payroll records" are particularly amenable to class certification. *Minns v. Advanced Clinical Emp. Staffing LLC*, 2015 U.S. Dist. LEXIS 71946, *26 (N.D. Cal. June 2, 2015) (citing Newberg on Class Actions § 4:50 (5th ed.) (common issues predominate when "individual factual determinations can be accomplished using computer records, clerical assistance, and objective criteria—thus rendering unnecessary an evidentiary hearing on each claim")); *Leyva v. Medline Indus. Inc.*, 716 F.3d at 514 (finding common issues predominated in part because defendant's "computerized payroll and time-keeping database would enable the court to accurately calculate damages and related penalties for each claim.").

The Labor Code, under which all the claims are brought, is to be interpreted "in light of the remedial nature of the legislative enactments authorizing the regulation of wages, hours and working conditions for the protection and benefit of employees, the statutory provisions are to be liberally construed with an eye to promoting such protection." *Brinker Rest. Corp. v. Super. Ct.*, 53 Cal.4th 1004, 1026-1027 (2012).

### B.    The Class and Subclasses Meet Rule 23(a)

Under Rule 23(a)(1), a proposed class must be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). There are approximately 4700 individuals who meet the class definition. *See Rannis v. Recchia*, 380 Fed.App'x. 646, 650-51 (9th Cir. 2010) (quoting Fed. R. Civ. P. 23(a)) (affirming certification of a class of 20). Plaintiffs' five proposed subclasses all meet numerosity. Plaintiffs' Opening Shift subclass has at least 2,667 class members;[6] Closing Shift subclass has approximately 2,724 class members;[7] Rest Break subclass has approximately 1,843 class members;[8]

---

[5] This discretion is informed by the fact that "[c]lass actions serve an important function in our system of civil justice," enabling vindication of "the rights of individuals who otherwise might not consider it worth the candle to embark on litigation in which the optimum result might be more than consumed by the cost." *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 99 n.11 (1981).

[6] This figure is based on Little Caesars' time records which show 2,667 potential class members who worked opening shifts. (Mendes Decl., Exhibit 3A.) An opening shift is defined as the first punch of the morning and the second punch or punches with the same timestamps. (*Id.*, Exhibit 3E.)

[7] This figure is based on Little Caesars' time records which show 2,724 potential class members who worked closing shifts. (Mendes Decl., Exhibit 4A.) A closing shift is defined as the last punch of the night and the second to the last punch or punches with the same timestamps. (*Id.*, Exhibit 4E.)

[8] Mendes Decl., Exhibit 1.

Regular Rate subclass has between 152 to 168 class members;[9] and Weekly Overtime Underpayment subclass has approximately 625 class members.[10]

Rule 23(a)(2) requires "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). "Rule 23(a)(2) has been construed permissively. The existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class." *Hanlon*, 150 F.3d at 1019–20. All questions of fact or law need not be common to satisfy the rule. *Id.* Rather, members of the class must share at least one question of fact or law. *Rodriguez v. Hayes*, 591 F.3d 1105, 1122 (9th Cir. 2010) (citation omitted); *see Abdullah v. U.S. Sec. Assocs.*, 731 F.3d 952, 957 (9th Cir. 2013) (all that commonality under Rule 23(a)(2) requires is "a single significant question of law or fact."). Plaintiffs address Rule 23(a)(2) for each of the subclasses in Section III.C., *infra*.

Under Rule 23(a)(3), the representative party must have claims or defenses that are "typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). Representative claims are typical of the class "if they are reasonably co-extensive with those of absent class members; they need not be substantially identical." *Hanlon*, 150 F.3d at 1020. The requirement is permissive. *Id.* Plaintiff Cuevas was a non-exempt crew member during the class period and subject to the policies and practices at issue here. Plaintiff Cuevas is a member of the Opening Shift and Rest Break Subclasses. (Cuevas Decl. ¶¶ 9-12.) Plaintiff Cuevas' claims are co-extensive with the claims of the class because they arise out of Little Caesars' same course of conduct. (*Id.*) Plaintiff Castillo is a non-exempt manager during the class period and subject to the policies and practices at issue here. Plaintiff Castillo is a member of the Opening Shift, Closing Shift, Rest Break, Regular Rate, and Weekly Overtime Underpayment Subclasses as well as the subclasses involving derivative claims, other than the waiting time penalties subclass. (Castillo Decl. ¶¶ 7-14.) Plaintiff Castillo's claims are co-extensive with the claims of the class because they arise out of Little Caesars' same course of conduct. (*Id.*) Proposed representative Gloria Hernandez was a non-exempt crew member during the class period and subject to the policies and practices at issue here. Ms. Hernandez is a member of the Opening Shift and Rest Break Subclasses as well as the subclasses involving all derivative claims. (Hernandez Decl. ¶¶ 6-8.) Ms. Hernandez's claims are co-extensive with the claims of the class

---

[9] There are 152 class members underpaid overtime adjustments and 168 class members with unpaid meal penalty adjustments, most, if not all, are the same individuals. (Mendes Decl., Exhibit 5.)
[10] Mendes Decl., Exhibit 2.

because they arise out of Little Caesars' same course of conduct. (*Id.*).

Rule 23(a)(4) requires that the representative parties fairly and adequately protect class members' interests. *See* Fed. R. Civ. P. 23(a)(4). To determine whether adequacy is satisfied, courts consider whether: "(1) . . . the representative plaintiffs and their counsel have any conflicts of interest with other class members, and (2) the representative plaintiffs and their counsel [will] prosecute the action vigorously on behalf of the class." *Staton v. Boeing Co.*, 327 F.3d 938, 957 (9th Cir. 2005). Here, Plaintiffs Cuevas and Castillo have and will continue to represent their coworkers with zeal and commitment. (Cuevas Decl. ¶¶ 16-21; Castillo Decl. ¶¶ 15-20.) They do not have conflicts with the class. (*Id.*) Similarly, proposed representative Hernandez will represent her coworkers with zeal and commitment. (Hernandez Decl. ¶¶ 9-14.) Ms. Hernandez has no conflicts with the class. (*Id.*)

Likewise, Plaintiffs' counsel satisfy the adequacy prong. Under Rule 23(g)(1)(A), courts consider the following factors in assessing class counsel: "(1) the work counsel has done in identifying or investigating potential claims in the action; (2) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (3) counsel's knowledge of the applicable law; and (4) the resources that counsel will commit to representing the class."

The Law Offices of Mark Yablonovich and Capstone Law have demonstrated that they have substantial experience and success in litigating, managing, and settling wage and hour class actions similar to the instant case. (*See* Yablonovich Decl. ¶¶ 4-7; Grant Decl. ¶¶ 3-7.) Plaintiffs' counsel are committed to dedicating resources to representing the class. (Yablonovich Decl. ¶¶ 8-9; Grant Decl. ¶¶ 8-9.)

Finally, although the Ninth Circuit no longer requires proposed classes to be "ascertainable" or "administratively feasible" (s*ee Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1126 (9th Cir. 2017)), here, an objective, mechanical process of locating employee records will not only define the scope of Plaintiffs' proposed Class and Subclasses, it will also help resolve the question of liability.

### C.    Common Questions of Law or Fact Predominate Plaintiffs' Theories of Liability

#### 1.    The Opening Shift Class Should Be Certified

##### (a)    Little Caesars' Opening Policies and Procedures Result in Unpaid Hours Worked

Plaintiffs allege that employees were not compensated for all hours worked during opening shifts.

Under California law, employees must be paid for all "hours worked." *See* 8 Cal. Code Regs. § 11050, subd. 2(K); *see also Mendiola v. CPS Security Solutions, Inc.*, 60 Cal.4th 833 (2015). An employer is liable for all "hours worked" by an employee, including the time the employee "is subject to control of an employer." *Morillion v. Royal Packing Co.*, 22 Cal.4th 575, 582 (2000). "[I]t is only necessary that the worker be subject to the control of the employer in order to be entitled to compensation." *Id.* at 584. An employer is deemed to have "suffered or permitted" an employee to work when the employer knew or should have known that the employee was working. *Id.* at 585. Plaintiffs contend that Little Caesars violated California law when it failed to pay for the time employees spent performing opening shift duties before they could clock in.

An off-the-clock claim can be established "'by proving that (1) [plaintiff] performed work for which he did not receive compensation; (2) that defendants knew or should have known that plaintiff did so; but that (3) the defendants stood idly by.'" *Jimenez v. Allstate Ins. Co.*, 765 F.3d 1161, 1165 (9th Cir. 2014) (quoting *Adoma v. Univ. of Phoenix, Inc.*, 270 F.R.D. 543, 548 (E.D. Cal. 2010)).

Little Caesars' store opening policies require work without pay. Little Caesars' policy that required at least two employees to open the store and perform work before clocking in resulted in uncompensated time. At opening, Little Caesars' policies require that "[t]wo or more colleagues arrive at the store to conduct opening procedures" and "[p]rior to the manager approaching the store, the parking lot and vicinity of the store should be thoroughly checked for any suspicious persons/vehicles," and then "[t]he [non-exempt] manager enters the facility, locks the front door and gives the 'all clear' sign for the secondary colleague to enter the premises." (Balderrama Decl., ¶ 30, Ex. E, at CUEVAS_CLASS_LCE-000219; *id.*, ¶ 32, Ex. E, at CUEVAS_CLASS_LCE-000196.) The member of management enters the store, deactivates the alarm, inspects the bathroom and walk-in cooler, and lets the second employee enter and both clock in at the same time. (Castillo Decl. ¶ 12; *see also* Borges Decl. ¶ 5; Bruner Decl. ¶ 5; Chang Decl. ¶ 5; Gomez Decl. ¶ 5; Ibarra Decl. ¶ 5; Martinez Decl. ¶ 5; Pedroza Decl. ¶ 5.)

A comparison of the alarm and time records reflects the gap of time between the alarm deactivation time and the clock-in.[11] (Mendes Decl. ¶¶ 27-28, Exhibit 3B, 3C, 3D.)

_____

[11] Little Caesars produced the store alarm activity records for a 14% sample of stores. (Balderrama Decl., ¶¶ 44-46.) Accordingly, Plaintiffs' expert analyzed the gap in time for the time records that correspondence to the 14% sampled alarm records. (See Mendes Decl. ¶¶ 24-28; *see also* Ex. 3C.)

1    Here, there is no individualized inquiry as to what or whether employees were asked to perform

2    any specific tasks—the uniform corporate policy requires employees to perform duties before clocking in.

3    **(b)    The Opening Shift Subclass Meets Rule 23(a)(2)**

4    Rule 23(a)(2) requires "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2).

5    Because all Opening Shift Class Members were subject to Little Caesars' opening policies and

6    procedures, the common questions of law or fact are:

7    • Whether Little Caesars maintained standardized store opening policies in its California stores
     during the class period that required at least two employees to open the store and perform
8      security/safety checks of the outdoor and indoor premises.
     • Whether Little Caesars' opening policy resulted in off-the-clock work before clocking in.
9    • Whether Opening Shift Class Members were under the compensable control of Little Caesars
       while off-the-clock by operation of the standardized store opening policies and/or procedures.
10   • Whether Opening Shift Class Members were paid for all time worked during opening shifts.
     • Whether Little Caesars knew or should have known that its opening policies and procedures
11     necessarily resulted in off-the-clock work.

12   A "yes" to any one of these significant common issues is sufficient to satisfy the "minimal" hurdle

13   posed by commonality. *Hanlon v. Chrysler Corp.*, 150 F.3d at 1020.

14   **(c)    Common Issues Predominate in the Opening Shift Class**

15   The question is whether requiring Opening Shift Class Members to perform visual security scans

16   of the parking lot and surroundings, unlock the door, in some instances unfasten the gate, disarm the

17   alarm, inspect the bathroom and walk-in cooler, and then give (and wait for) the 'all clear' to enter the

18   store, all before clocking in—constitutes being under Little Caesars' control, and whether Little Caesars

19   knew or should have known the duties were being performed before clocking in. These predominant

20   questions will be answered by common proof. The common proof includes Little Caesars' policies and

21   opening procedures that require employees to arrive at the store and perform tasks before being permitted

22   to clock in. Store opening procedures are by nature amenable to class treatment because the claim arises

23   out of a uniform company policy that is applied to a class of employees. Where plaintiffs attack official or

24   uniform policies requiring off-the-clock work commonality and predominance are met because liability

25   turns on the legality of the policy, not each employee's individual circumstances or damages.[12]

26   _____
     [12] *See, e.g.*, *Kurihara v. Best Buy Co.*, No. C. 06-01884, 2007 U.S. Dist. LEXIS 64224, at *30
27   (N.D. Cal. Aug. 30, 2007) (certifying class alleging uncompensated security checks because legality of
     uniform policy was a common question reasoning that "although [the] plaintiff has submitted little or no
28   evidence as to the implementation of that policy, the detailed nature of the policy itself, and the reasonable
     inferences which can be drawn from them, constitute sufficient evidence to satisfy plaintiff's burden as to

This type of documented off-the-clock work is by nature amenable to class treatment because the claim arises out of a uniform policy that is consistently applied to a class of employees. *See, e.g.*, *Frausto v. Bank of Am.*, 334 F.R.D. 192 (N.D. Cal. 2019) (court certified off-the-clock claim based on starting up computers and logging off at the end of the day); *Alvarez v. IBP, Inc.*, 339 F.3d 894 (9th Cir. 2003) (donning and doffing off-the-clock); *Rodriguez v. URS Midwest, Inc.*, 2023 U.S. Dist. LEXIS 143826 (C.D. Cal. Aug. 15, 2023) (court granted off-the-clock subclass).

Common evidence exists to establish the time spent working off the clock. Plaintiffs' data expert analyzed the time gap between the timestamps in the sampled store alarm records and clock-in timestamps and determined demonstrable periods of unpaid time. (Mendes Decl. ¶¶ 24-28.) Plaintiffs' survey expert has also presented evidence that the amount of opening shift off-the-clock work can be readily established through a survey. (*See generally* Petersen Decl.; *see also id.*, ¶¶ 2-5, 21.) These common issues are subject to common proof and are exactly the types of issues that should be certified.

## 2. The Closing Shift Class Should Be Certified

### (a) Little Caesars' Closing Policies and Procedures Result in Unpaid Hours Worked

Plaintiffs allege that employees were not compensated for closing shifts after clocking out and before being able to leave. Because doors were required to be locked when the stores closed to the public, employees were not free to go until the alarm was set and they all exited together.

As set forth in Section III.C.1.(a), *supra*, employees must be paid for all "hours worked." Here, Little Caesars' corporate policies require employees to clock out and *then* perform regularly required closing tasks.

Employers have a statutory obligation to keep accurate time records. Here, Little Caesars did not

the predominance of common questions….Furthermore, defendant's assertions regarding the failure of its employees to properly implement the company's standard policies do not convince the court that substantial variations exist. Where a plaintiff challenges a well-established company policy, a defendant cannot cite poor management to defend against class certification….In sum, the individualized inquiries are directed principally toward damages rather than liability. Defendant's due process interests will be preserved by affording it an opportunity to defend the nature and legality of its company-wide policy, and through individualized analysis related to damages."). Also, "Defendants cannot disprove the existence of their own acknowledged policy by asserting that isolated employees failed to comply with it." *See Vedachalam v. Tata Consultancy Servs., Ltd.*, No. C 06-0963 CW, 2012 U.S. Dist. LEXIS 46429, at * 37-38 (N.D. Cal. Apr. 2, 2012).

capture or record the time worked by employees after they clocked out on closing shifts. California law imposes on employers the duty to pay employees for every minute they are "subject to the control of the employer," and to create and preserve records that verify those minutes.

> [W]here the employer's records are inaccurate or inadequate and the employee cannot offer convincing substitutes, a more difficult problem arises. The solution, however, is not to penalize the employee by denying him any recovery on the ground that he is unable to prove the precise extent of uncompensated work. Such a result would place a premium on an employer's failure to keep proper records in conformity with his statutory duty; it would allow the employer to keep the benefits of an employee's labors without paying due compensation as contemplated by the Fair Labor Standards Act. In such a situation we hold that an employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference. The burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence.

*Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687-688 (1946); *Amaral v. Cintas Corp. No. 2*, 163 Cal.App.4th 1157, 1189 (2008) ("California courts have shifted the burden of proof to employers when inadequate records prevent employees from proving their claims for unpaid overtime hours . . . [and] . . . permit class action plaintiffs to prove their damages for unpaid overtime by the use of statistical sampling."); *see also Hernandez v. Mendoza*, 199 Cal.App.3d 721 (1988) (an employee need only produce a reasonable estimate of uncompensated time, after which the burden of proof shifts to the employer to either produce precise records or rebut the estimate's reasonableness).

The California Supreme Court states that the obligations to keep accurate records and to pay for all hours worked are non-delegable because employers alone control the conditions of work and possess the resources to track time accurately. *Troester v. Starbucks Corp.*, 5 Cal.5th 829, 848 (2018) ("employers are in a better position than employees to devise alternatives that would permit the tracking of small amounts of regularly occurring worktime," and warning that an employer may not exploit its own recordkeeping shortcomings to avoid payment).[13]

Little Caesars required employees to remain under its control *after* clocking out on closing shifts.

---

[13] In *Troester*, the defendant did not pay the plaintiff wages for performing store closing tasks after he clocked out. The defendant required the plaintiff to perform off the clock work such as initiate the software's close store procedure, activate the alarm, exit the store, lock the front door, and also walk his co-workers to their cars. *Id.*

(Balderrama Decl. ¶ 36, Ex. E, at CUEVAS_CLASS_LCE-000374.[14])

During the proposed class period, the closing procedure policy uniformly applied to all corporate-owned California store employees. (*Id.* ¶¶ 26-29, Ex. E, at CUEVAS_CLASS_LCE-000195 ["It outlines certain policies that Little Caesar Enterprises, Inc. utilizes for company owned restaurants."].)

Liability and damages here can be determined by reference to the closing policies and procedures and comparing the time and store alarm records. Plaintiffs will compare the punch-out times of closing shift employees with the timestamps of the alarm records to show they were under Little Caesars' control, that Little Caesars knew, and to measure the amount of unpaid time. (Mendes Decl. ¶¶ 30-33, Ex. 4B, 4C.)

**(b)    The Closing Shift Class Meets Rule 23(a)(2)**

Rule 23(a)(2) requires "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Because all Closing Shift Class Members were subject to Little Caesars' store closing policy and procedures, the common questions of law or fact are:

- Whether Little Caesars maintained standardized store closing policies in its California stores during the class period requiring at least two employees in the store until all tasks were completed, including setting the alarm and relocking the door.
- Whether Little Caesars' closing policies resulted in off-the-clock work after clocking out on closing shifts.
- Whether Closing Shift Class Members were under the control of Little Caesars by operation of the standardized closing procedures.
- Whether Closing Shift Class Members were paid for all time worked during closing shifts.
- Whether Little Caesars knew or should have known that its closing policies and procedures necessarily resulted in employees being under its control.

Any one of these significant common issues alone would be sufficient to satisfy the "minimal" hurdle posed by commonality. *Hanlon*, 150 F.3d at 1020.

**(c)    Common Issues Predominate in the Closing Shift Class**

Rule 23(b)(3) requires "the court find[ ] that the questions of law or fact common to class members predominate over any questions affecting only individual members and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." The "predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by

---

[14] Time Management Guidelines "Close" section first lists "Turn off open sign. Lock front doors." Fourth to the last states "Ensure all employees are clocked out." The next listed task is "Turn off lights (including walk-in cooler & bathroom) and air conditioner…." Finally, it states "Set alarm, unlock and exit….and relock. Always double-check that door is locked!". (Balderrama Decl., ¶ 36, Ex. E.)

representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997).

Under Little Caesars' store closing protocol, compensable time occurs after employees clock out. The Security Guidelines and Time Management Guidelines—uniform for all California corporate-owned stores—direct colleagues to lock the front doors, finish a checklist of shutdown tasks, activate the alarm, exit together and relock the doors.[15] (Balderrama Decl., ¶ 36, Ex. E, at CUEVAS_CLASS_LCE-000374.) While this sequence unfolds, employees remain on the premises under the company's control; the entire gap between the punch-out and the alarm-set therefore qualifies as "hours worked" under *Morillion* and *Mendiola*. Whether that gap exists and whether Little Caesars knew about it are answered with the same common evidence: (1) the written policies themselves; (2) punch-clock and alarm reports, which show a measurable delay between the out-punch and alarm activation. A records analysis reliably demonstrates who the class members are and how much time is owed. (*See* Mendes Decl. ¶¶ 29-33.)

Common evidence exists to establish the amount of uncompensated time spent off the clock. Plaintiffs' survey expert has also presented evidence that the amount of off-the-clock work can be readily established through a survey. (*See generally* Petersen Decl.; *see also id.* ¶¶ 2-5, 21.) Because class members are subject to the same rules and a common data analysis can calculate gaps of time between an out-punch timestamp and an alarm activation timestamp, the questions of compensable work and employer awareness are capable of resolution in one stroke, satisfying Rule 23(a)(2) commonality and establishing predominance under Rule 23(b)(3).

### 3.    The Rest Break Class Should Be Certified

#### (a)    Little Caesars' Facially Invalid Rest Break Policy Resulted in a Failure to Provide Rest Breaks

An employer's obligation to provide its employees with rest periods arises under the IWC Wage Orders. "Every employer shall authorize and permit all employees to take rest periods, which insofar as practicable shall be in the middle of each work period. The authorized rest period time shall be based on the total hours worked daily at the rate of ten (10) minutes net rest time per four (4) hours or major fraction thereof." 8 Cal. Code Reg., § 11050(12)(A). Labor Code section 226.7(a) provides that "[n]o employer

---

[15] Some stores have outdoor security gates which take additional time to secure both at closing and opening shifts.

1    shall require any employee to work during any… rest period mandated by an applicable order of the

2    Industrial Welfare Commission."

3        An employer must show that it properly articulates the entitlement to rest periods, which means it

4    must clearly communicate the number of rest periods provided. *See Bufil v. Dollar Fin. Grp., Inc.*, 162

5    Cal.App.4th 1193, 1199 (2008) (the "onus is on the employer to clearly communicate the authorization

6    and permission [to take rest periods] to its employees."); *see also Godfrey v. Oakland Port Services Corp.*,

7    230 Cal.App.4th 1267, 1286-1287 (2014) (to meet the 'provide' standard, an employer, at a *minimum*, has

8    to inform its employees in a "meaningful or consistent way" that they could take meal and rest periods).

9        Shifts from 3.5 hours up to 6 hours entitle employees to a first rest period and shifts longer than

10    ten hours to a third rest period. *See* 8 Cal. Code Reg., § 11050(12)(A). However, Little Caesars did not

11    authorize rest periods for shifts of 3.5 hours and shifts longer than ten hours. (*See* Balderrama Decl., ¶¶ 19-

12    22, Ex. C, at CUEVAS_LCE-000245 ["0 - 3.50 | 0 Rest Period"; "6.01 – 10 | 2 Rest Period". "Colleagues

13    who fail to comply with Little Caesar's [Rest Break Policy] will be subjected to Corrective Action, up to

14    and including immediate termination of employment."])[16] Little Caesars' rest break policy was

15    consistently applied. (*Id.*, Ex. K, at 121:18-122:1.) While Little Caesars may argue that other parts of its

16    rest period policy identified shifts of 3.5-hours as being entitled to rest breaks, Little Caesars cannot deny

17    that its table expressly does not provide rest breaks to shifts of exactly 3.5 hours or third rest breaks to

18    shifts longer than 10 hours. In fact, during the course of this litigation, Little Caesars corrected its rest

19    break table. (*See* Balderrama Decl., ¶ 47, Ex. G, at CUEVAS_CLASS_LCE-017056 (April 9, 2025).)

20        A policy that does not authorize and permit a rest period establishes liability:

21        An employer is required to authorize and permit the amount of rest break time
        called for under the wage order for its industry. ***If it does not***—if, for example, it
22        adopts a uniform policy authorizing and permitting only one rest break for
        employees working a seven-hour shift when two are required—***it has violated the***
23        ***wage order and is liable. No issue of waiver ever arises for a rest break that was***
        ***required by law but never authorized; if a break is not authorized, an employee***
24        ***has no opportunity to decline to take it.***

25    *Brinker Rest. Corp. v. Super. Ct.*, 53 Cal. 4th at 1053 (emphasis added); *Abdullah v. U.S. Sec. Assocs.*, 731

26    F.3d 952, 968 (9th Cir. 2013).[17]

27        _____

        [16] Balderrama Decl., ¶¶ 19-22; *see also* Ex. K, Ambrosia Dep. Tr., 123:6-8 ["Q: Under the policy
28    shifts anywhere from 0 to 3 and a half hours are entitled to 0 rest periods, right? A. That is correct."].
        [17] The fact that some employees may have taken compliant rest breaks despite the illegal policy

1    Little Caesars' failure to authorize and permit rest periods for shifts of 3.5 hours and third rest

2    periods for shifts longer than ten hours violates California law. Class members confirm that rest breaks

3    were not provided. (Cuevas Decl. ¶ 11; Castillo Decl. ¶ 11; Hernandez Decl. ¶ 7; Borges Decl. ¶ 7-8;

4    Bruner Decl. ¶ 8; Flores Decl. ¶ 7; Gomez Decl. ¶ 9; Ibarra Decl. ¶ 8; Luna Decl. ¶ 5-6; Martinez Decl. ¶

5    8; Munoz Decl. ¶ 6; Muro Decl. ¶ 6; Pedroza Decl. ¶ 7; Velasco Decl. ¶ 5.)

6        Here, there is no individualized inquiry as to whether Little Caesars' rest break policy failed to

7    provide paid breaks to 3.5-hour shifts or shifts longer than ten hours during the relevant time period—the

8    uniform corporate policy failed to do so.

9    **(b)    The Rest Break Class Meets Rule 23(a)(2)**

10        Because all Rest Break Class Members were subject to Little Caesars' invalid rest break policy,

11    the common questions of law or fact are:

12    - Whether Little Caesars' rest break policy unlawfully failed to authorize a rest period to
       employees who worked exactly 3.5-hour shifts and is required to pay employees who worked
13       shifts of exactly 3.5 hours an additional hour of compensation.
     - Whether Little Caesars' rest break policy unlawfully failed to authorize a rest period to
14       employees who worked shifts longer than ten hours and is required to pay employees who
         worked shifts longer than ten hours an additional hour of compensation.
15

16        Any one of these significant common issues alone would be sufficient to satisfy the "minimal"

17    hurdle posed by commonality. *Hanlon*, 150 F.3d at 1020.

18    **(c)    Common Issues Predominate in the Rest Break Class**

19        Employers are liable if they fail to provide rest periods. Classwide liability starts with the question

20    of whether Little Caesars' rest period policy with respect to 3.5-hour shifts and shifts longer than ten hours

21    is illegal. Rule 23(b)(3) is met here because the question will be predominately answered with common

22    proof, mainly by reference to Little Caesars' classwide rest period policy and testimony from its corporate

23    representatives. Whether the rest period policy is facially illegal is by its nature amenable to class

24    treatment because the claim arises out of a uniform company policy applied to a class of employees. *See*

25    *Brinker v. Super. Ct.*, 53 Cal.4th at 1053 (if an employer adopts a policy only permitting, for example, one

26    rest break when two are required, "it has violated the wage order and is liable.").

27    _____

28    does not defeat liability. *Kurihara v. Best Buy Co.*, No. C. 06-01884, 2007 U.S. Dist. LEXIS 64224, at
     *30 (N.D. Cal. Aug. 30, 2007); *Vedachalam v. Tata Consultancy Servs., Ltd.*, No. C 06-0963, 2012 U.S.
     Dist. LEXIS 46429, at * 37-38 (N.D. Cal. Apr. 2, 2012).

1    That determination can be accomplished in a single stroke. Once established, the calculation of the

2    unpaid rest period premiums is readily determinable through an analysis of the time and payroll records of

3    the class members.[18]

4              **4.        The Regular Rate Class Should Be Certified**

5              **(a)        Miscalculated Regular Rates of Pay Results in Unpaid Wages**

6    Plaintiffs allege that Little Caesars did not properly pay overtime wages, meal premiums, and sick

7    pay to employees who earned nondiscretionary bonuses, incentives, or shift differentials.

8    Under California law, all nondiscretionary pay must be included in an employee's regular rate of

9    pay for purposes of calculating overtime and premium wages. Cal. Lab. Code § 200. "Regular rate of pay,

10   which can change from pay period to pay period, includes adjustments to the straight time rate, reflecting,

11   among other things…the per-hour value of any nonhourly compensation the employee has earned."

12   *Alvarado v. Dart Container Corp. of Cal.*, 4 Cal.5th 542, 554 (2018). "When calculating the regular rate

13   of pay for purposes of overtime calculation under the IWC Orders, non-discretionary bonuses must be

14   calculated into the formula." DLSE Enforcement Policies and Interpretation Manual (2002), ¶ 35.7.

15   Likewise, for meal premiums, "the term 'regular rate of compensation' in section 226.7(c) has the

16   same meaning as 'regular rate of pay' in section 510(a) and encompasses not only hourly wages but all

17   nondiscretionary payments for work performed by the employee." *Ferra v. Loews Hollywood Hotel, LLC*,

18   11 Cal.5th 858, 878 (2021); *see also* Cal. Lab. Code § 246(*l*) ("paid sick time for nonexempt employees

19   shall be calculated in the same manner as the regular rate of pay for the workweek…").

20   During the class period, Little Caesars paid nondiscretionary bonuses to certain eligible

21   employees. (Balderrama Decl., ¶ 48, Ex. H at CUEVAS_LCE-000275.) However, Little Caesars did not

22   always correctly incorporate the additional remuneration into the regular rate of pay calculation. (*See*

23   Balderrama Decl., ¶¶ 49-54; *see also* Mendes Decl. ¶¶ 35-48.) First, from the beginning of the class period

24   until January 2021, although Little Caesars attempted to incorporate bonus pay into the regular rate

25   calculation for overtime wages, Little Caesars incorrectly added PTO hours into the overtime adjustment

26   equation. Because PTO hours are not hours worked and should not be included into the regular rate

27   ───────────────

28   [18] The pay records do not show that Little Caesars paid any rest period premiums. Moreover,
Plaintiffs' survey expert has presented evidence as to whether rest breaks were provided can be readily
established through a survey. (*See generally* Petersen Decl.; *see also id.* ¶¶ 2-5, 21.)

adjustment, Little Caesars diluted the regular rate value for overtime. Little Caesars made these incorrect

bonus adjustments to the overtime regular rate calculation from May 2019 to January 2021. (*Id.*; *see also*

Mendes Decl. ¶ 43.) In the second pay period of January of 2021, it appears that Little Caesars

discontinued its practice of including PTO hours into the overtime regular rate adjustments.

Second, from May 12, 2019 to February 28, 2023, Little Caesars never attempted to incorporate

bonus pay into the regular rate calculation for meal premiums. Little Caesars did not start to adjust the

regular rate of pay for meal premiums to include bonus pay until February 28, 2023.[19] (*See* Mendes Decl.

¶ 48.) Little Caesars has never adjusted sick pay regular rate. (*Id*., fn 24.)

### (b)     The Regular Rate Class Meets Rule 23(a)(2)

Rule 23(a)(2) requires "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2).

Because all Regular Rate Class Members were subject to Little Caesars' incorrect regular rate of pay

calculations when they earned bonuses, commonality is met, and the common questions of fact or law are:

- Whether the bonuses paid by Little Caesars must be included in the regular rate of pay and whether Little Caesars illegally excluded them from the regular rate calculation.
- Whether Little Caesars incorrectly calculated the overtime regular rate by including Paid Time Off (PTO) during part of the class period?
- Whether Little Caesars' failure to incorporate bonuses into the regular rate of pay for overtime, meal premiums, and sick time violated California law?

Fed. R. Civ. P. 23(a)(2).

### (c)     Common Issues Predominate in the Regular Rate Class

Plaintiffs' Regular Rate Class challenges Little Caesars' policy and practice that fails (or failed) to

include nondiscretionary bonuses in the regular rate calculation for overtime pay, meal premiums, and

sick pay. Little Caesars pays non-exempt managers bonuses based on formulaic criteria, making the bonus

nondiscretionary. A simple assessment of the legality of that formula or payroll algorithm is what

predominates. The payroll records show instances in which managers were paid those bonuses. The

payroll records also show Little Caesars (1) incorrectly included PTO hours in the regular rate calculation

---

[19] During the course of the litigation, Little Caesars attempted to pay some employees retroactively for having failed to properly adjust the meal premium regular rate of pay. It appears Little Caesars only attempted to pay current employees (or those who were currently employed as of June of 2023), and did not disclose this to Plaintiffs' counsel for approximately 11 months (despite its duty under Federal Rule of Civil Procedure 26(e)). It does not appear any interest was paid on the belated payments, so even those employees that received late adjustments have not been made whole.

for overtime through January of 2021; (2) failed to include bonuses into the regular rate calculation for meal premiums until at least February 28, 2023; and (3) failed to pay sick time at the regular rate of pay. (*See* Mendes Decl. ¶¶ 35-48.) The miscalculation of the regular rate of pay is amenable to class treatment because the claim arises out of uniform application of arithmetic errors and the legality of formulae that can be resolved in a single stroke.[20]

Indeed, by issuing retroactive pay to some (but not all) of the employees eligible for regular rate adjustments, Little Caesars admits to incorrectly calculating the regular rate of pay during part of the class period. (*See* Balderrama Decl. ¶ 49, Ex. I at pg. 5, lines 18-19 and pg. 6, lines 20-21; *id.* ¶ 50, Ex. J; *id.*, ¶ 51; Ex. N, Hill Dep. Tr. at 74:19–74:20 [The witness confirms these adjustments were paid in December of 2023 and went back retroactively to 2021], *id.*, 74:21–75:2 [The witness refused to answer whether adjustments went back to May 2019 due to privilege concerns].) Little Caesars' attempted correction constitutes common classwide proof of liability and predominates over any individualized issues. As demonstrated in Plaintiffs' data expert's declaration, common proof exists to establish these violations on a class wide basis. (*See* Mendes Decl. ¶¶ 35-48, Exhibit 5.)

**5.    The Weekly Overtime Underpayment Class Should Be Certified**

**(a)    Little Caesars Incorrectly Calculated Weekly Overtime**

Little Caesars' failure to include **daily** overtime hours worked into the calculation of weekly overtime hours worked was unlawful. Under Labor Code section 510(a):

> Eight hours of labor constitutes a day's work. Any work in excess of eight hours in one workday **and any work in excess of 40 hours in any one workweek** … shall be compensated at the rate of no less than one and one-half times the regular rate of pay for an employee.

Cal. Lab. Code § 510(a) (emphasis added). As such, *any work* performed in excess of 40 hours in a workweek should be compensated at the overtime rate. *Id.*

Little Caesars' uniform overtime formula violates California law. As confirmed by the Company Handbook and corporate representative testimony Little Caesars computes weekly overtime as follows:

---

[20] *See, e.g., Faulkinbury v. Boyd & Assocs., Inc.*, 216 Cal.App.4th 220, 229 (2013) ("the legality of Boyd's policy of excluding the bonus from calculating overtime wages can be determined on a class-wide basis."); *Escano v. Kindred Healthcare Operating Co., Inc.*, No. 09-04778, 2013 U.S. Dist. LEXIS 29899, at *18-20 (C.D. Cal. Mar. 5, 2013) (certifying regular rate class for failure to include shift differentials and bonus compensation in the regular rate calculation); *Howell v. Advantage RN, LLC*, No. 17-CV-0883 JLS (BLM), 2018 U.S. Dist. LEXIS 119360 (S.D. Cal. July 17, 2018) (certifying a regular rate class).

1    "Only hours worked at straight-time apply to the weekly 40-hour limit. Once a colleague has been paid

2    overtime for hours over eight in a day, those overtime hours do not count toward the weekly 40-hour

3    limit." (Balderrama Decl., ¶ 23, Ex. B; *id.*, ¶ 24, Ex. D; *see also* Ex. K, Ambrosia Dep. Tr. at 115:25-

4    116:5.) The company's Rule 30(b)(6) designee on timekeeping, however, conceded that both straight-time

5    and daily-overtime hours should be included when calculating whether the 40-hour weekly threshold is

6    reached. (Balderrama Decl., ¶ 58, Ex. M, Gomez Dep. Tr., at 67:5-13.)

7        Overtime pay is required for **any work** over 40 hours in a week, and that means adding up all the

8    work performed (work performed at the straight time rate of pay as well as work performed at the daily

9    overtime rate of pay). Little Caesars only counts work performed at the straight time rate of pay as hours

10   towards the weekly 40. Therefore, some work that employees perform over 40 hours does not get paid at

11   the *weekly* overtime rate. For example, if an employee works grueling 12-hour shifts on Monday,

12   Tuesday, and Wednesday (totaling 36 hours) and then works only 8 hours on Thursday (totaling 44

13   hours), Little Caesars does not pay that employee overtime pay for those 4 hours over 40 because they had

14   only worked 24 straight time hours in the preceding three days. This is because Little Caesars only counts

15   the non-overtime hours (straight time) worked towards the 40 weekly hours for paying weekly overtime.

16   This practice contradicts the plain reading of the statute, as the Code mandates that *any* work in excess of

17   40 hours must be paid at an overtime rate of pay, not solely the work hours paid at the straight-time rate.

18       Two principles obligate Labor Code section 510(a) to require Little Caesars to pay for any work

19   performed over 40 hours in a workweek (and to not exclude daily overtime hours worked):

20           First, the obligation to pay premium pay for overtime work reflects a state policy
             favoring an eight-hour workday and a six-day 40-hour workweek, and
21           discouraging employers from imposing work in excess of those limits. [Citation
             omitted.] Second, the state's labor laws are to be liberally construed in favor of
22           worker protection. [Citation omitted.]

23   *Alvarado v. Dart Container Corp. of California*, 4 Cal.5th 542, 561–562 (2018), as modified (Apr. 25,

24   2018). Thus, in *Alvarado*, the California Supreme Court stated it was "obligated to prefer an interpretation

25   that discourages employers from imposing overtime work and that favors the protection of the employee's

26   interests." *Id.* Yet, under Little Caesars' overtime policy, it can frontload long grueling shifts on employees

27   and then avoid paying overtime in subsequent shifts despite employees' overall hours worked for the week

28   exceeding 40 hours. The unlawfulness of that policy is not governed by any individualized experience.

**(b)**    **The Weekly Overtime Underpayment Class Meets Rule 23(a)(2)**

Rule 23(a)(2) is satisfied when a single question of law or fact can drive the resolution of the entire class claim which is the case here because all members of this Class were paid under the same formula which excludes hours paid at the daily-overtime rate from the 40-hour weekly calculation. That uniform policy and practice raises classwide questions that can be answered in one stroke for every employee:

- Whether Little Caesars' exclusion of hours paid at the daily-overtime rate from the calculation of the 40-hour weekly total violates Labor Code section 510(a)'s requirement that "any work in excess of 40 hours in any one workweek" be compensated at the overtime rate.
- Whether Little Caesars' exclusion of hours paid at the daily-overtime rate from the 40-hour weekly total causes underpayment of weekly overtime?

Rule 23(a)(2) is satisfied. *Hanlon*, 150 F.3d at 1020.

**(c)**    **Common Issues Predominate in the Weekly Overtime Class**

Little Caesars' overtime policy and practice is to only count straight-time hours toward the 40-hour weekly threshold and automatically exclude all hours paid at the daily-overtime rate. Liability hinges on a single classwide inquiry into the legality of this uniform overtime arithmetic. Common proof can resolve the claim on a classwide basis through evidence such as company policy manuals showing the overtime formula; time and payroll data confirming the formula was applied to employees and the identity of those employees; and expert analysis that matches payroll and time record outputs and quantifies the underpayment of weekly overtime. Plaintiffs' data expert analyzed the time and pay records produced by Little Caesars and determined demonstrable periods of underpaid time. (Mendes Decl. ¶¶ 13-19, Ex. 2.)

**D.**    **The Court Should Certify the Derivative Claims**

The operative complaint includes claims for non-compliant wage statements, untimely payment of wages during employment and at termination, secret underpayment of wages, and violations of California's unfair competition laws. These claims are derivative of Plaintiffs' claims for off-the-clock work, rest break violations, miscalculation of the regular rate of pay, and miscalculated weekly overtime. If the Court certifies the proposed classes, the Court should certify these derivative claims as well.[21]

---

[21] *See, e.g.*, *Arredondo v. Delano Farms Co.*, 301 F.R.D. 493, 545-46 (E.D. Cal. 2014) (noting that California Labor Code sections 203 and 226 claims are "routinely considered derivative of the underlying state law claims upon which class certification is based," and amending the certification order, which noted these claims but did not specifically discuss them in certifying underlying subclasses) (citing *Avilez v. Pinkerton Gov't Servs.*, 286 F.R.D. 450, 464 (C.D. Cal. 2012); *White v. Starbucks Corp.*, 497 F. Supp.2d 1080, 1085, 1089-90 (N.D. Cal. 2007); *Dilts v. Penske Logistics, LLC*, 267 F.R.D. 625, 640 (S.D. Cal. 2010)).

1

E.      **Class Action Is Superior to Other Available Methods for Fairly and Efficiently**

2

**Adjudicating the Controversy**

3

A case is certifiable when "a class action is superior to other available methods." Fed. R. Civ. P.

4

23(b)(3). Courts evaluate superiority by considering: (1) class members' interest in individually

5

controlling separate actions; (2) the extent and nature of existing litigation by class members; (3) the

6

desirability of concentrating claims in the particular forum; and (4) likely management difficulties. *Id.*

7

Superiority tests whether "classwide litigation of common issues will reduce litigation costs and

8

promote greater efficiency." *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996). Here,

9

superiority is met because one trial resolving all claims, instead of hundreds, if not thousands, of trials, is

10

superior. Courts routinely find class actions to be the superior method of adjudicating claims in the wage

11

and hour context.[22] (*See generally* Plaintiffs' Proposed Trial Plan; *see also* Borges Decl. ¶ 9-10; Bruner

12

Decl. ¶ 10-11; Chang Decl. ¶ 7-8; Flores Decl. ¶ 9-10; Gomez Decl. ¶ 11-12; Ibarra Decl. ¶ 10-11; Luna

13

Decl. ¶ 7-8; Martinez Decl. ¶ 10-11; Mercado Decl. ¶ 6-7; Munoz Decl. ¶ 8-9; Muro Decl. ¶ 8-9; Pedroza

14

Decl. ¶ 9-10; Velasco Decl. ¶ 6-7.)

15

Class treatment is superior to a multitude of individual actions because these claims are relatively

16

small, filing fees and other litigation costs would typically exceed any potential recovery and because class

17

members' claims can be proven using common methods of proof, including Little Caesars' uniform

18

company-wide policies and practices, testimony of Little Caesars' corporate representatives and senior

19

management, time and wage records, and store alarm activity reports.

20

If certified, this class action will be manageable. (*See* Plaintiffs' Proposed Trial Plan.) After

21

certification, class notice will be sent out pursuant to Rule 23(c)(2)(B) to employees who have known

22

contact information. Upon certification, routine merits discovery will proceed until the Proposed Class

23
24
25
26
27
28

---

[22] *See, e.g.*, *Kamar v. Radio Shack Corp.*, 254 F.R.D. 387, 405, 406 (C.D. Cal. 2008) ("Employer practices and policies with regard to wages and hours often have an impact on large number of workers in ways that are sufficiently similar to make class-based resolution appropriate and efficient" and finding that "[n]umerous individual actions would be expensive and time-consuming"); *Jimenez v. Allstate Ins. Co.*, 765 F.3d 1161, 1164 (Ninth Circuit affirmed district court finding that "class treatment was a superior method of adjudication because statistical sampling of class members could accurately and efficiently resolve the question of liability, while leaving the potentially difficult issue of individualized damage assessments for a later day.") Courts have widely recognized that employer practices affecting large numbers of employees are particularly well suited for class treatment. *See Lerwill v. Inflight Motion Pictures, Inc.*, 582 F.2d 507, 512-13 (9th Cir. 1978) (affirming certification of class alleging unpaid overtime).

Representatives try the case before a jury. The trial will involve this Court receiving evidence consisting of Little Caesars' designated corporate representatives' testimony pursuant to Rule 30(b)(6), Plaintiffs' testimony, other witnesses (representative testimony from some class members, experts, etc.), documentary evidence such as Little Caesars' Employee Handbooks, time records, wage records, alarm records, training materials and other relevant documentary evidence. Given that most of Plaintiffs' theories hinge on Little Caesars' policies and records, those classes will not require statistical sampling or surveys at liability. But to the extent any of Plaintiffs' theories may require statistical sampling or surveys, as "to liability, the use of statistical sampling, at least when paired with persuasive direct evidence, is an acceptable method of proof in a class action." *Dilts v. Penske Logistics, LLC*, 267 F.R.D. 625, *33-34(S.D. Cal. Apr. 26, 2010); *see also Jimenez v. Allstate Ins. Co.*, 765 F.3d at 1167 ("circuit courts including [the Ninth Circuit] have consistently held that statistical sampling and representative testimony are acceptable ways to determine liability.").

Assuming liability is established, survey and representative testimony can be used to calculate damages. Such practice is common. *See, e.g.*, *Martin v. Selker Bros., Inc.*, 949 F.2d 1286, 1296-98 (3d Cir. 1991) (holding that it is "not necessary for every single affected employee to testify in order to prove violations or to recoup back wages" and that "[t]he testimony and evidence of representative employees may establish prima facie proof of a pattern and practice of FLSA violations"). Indeed, statistical sampling has been specifically endorsed to determine class member damages for missed meal and rest breaks. See *Dilts v. Penske Logistics, LLC*, 267 F.R.D. 625, *33-34 (S.D. Cal. Apr. 26, 2010) (also stating that "it is quite plain to the Court that statistical sampling is appropriate in cases like this one" and that "California and Federal courts have not discouraged the use of statistical sampling in determining class member damages) (citing *Sav-On Drug Stores, Inc.*, 34 Cal.4th 319 (2004) and *Bell v. Farmers Ins. Exchange*, 115 Cal.App.4th 715 (2004)).

## IV.    CONCLUSION

For all the foregoing reasons, Plaintiffs respectfully request the Court grant Class Certification and appoint Plaintiffs Jose Cuevas, Dora Meza de Castillo, and Proposed Plaintiff/Representative Gloria Hernandez and Counsel as adequate representatives of the Classes, order Class Notice, and any other relief the Court deems just and proper.

1

Dated:  September 2, 2025

Respectfully submitted,

2

**LAW OFFICES OF MARK YABLONOVICH**

3

4

By:   _/s/MarkYablonovich_

Mark Yablonovich
Monica Balderrama

5

6

**CAPSTONE LAW APC**
Melissa Grant
Bevin Allen Pike
Daniel Jonathan
Trisha K. Monesi

7

8

9

Attorneys for Plaintiffs Jose Cuevas, Dora Meza de
Castillo, Proposed Representative Gloria Hernandez,
and the Putative Class

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

Case No. 3:23-cv-03166-RFL